# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**BILLY SATTERWHITE,**

           **Plaintiff,**

-vs-                                       **Case No.  3-:02-CV-574**

**FAURECIA EXHAUST SYSTEMS, INC.,**

                                       **Judge Thomas M. Rose**

           **Defendant.**

_____

### ENTRY AND ORDER GRANTING PLAINTIFF'S MOTION FOR AWARD OF ATTORNEY FEES (Doc. #32) AND GRANTING IN PART AND OVERRULING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. #42)

_____

      This matter arises from the employment and subsequent termination of Plaintiff Billy Satterwhite ("Satterwhite") by Defendant Faurecia Exhaust Systems, Inc. ("Faurecia"). Satterwhite brings five Causes of Action. His First Cause of Action is for race discrimination in violation of Title VII, 42 U.S.C. §2000e et seq. Satterwhite's Second Cause of Action is for race discrimination in violation of Ohio's civil rights statute, O.R.C. §4112.02/4112.99. His Third Cause of Action is for racial harassment/hostile work environment in violation of Title VII and Ohio law. Satterwhite's Fourth Cause of Action is for wrongful discharge in violation of Ohio public policy and his Fifth Cause of Action is for retaliation in violation of Ohio law, O.R.C. §4112.02(I) and §4112.99.

      Now before the Court are Satterwhite's Motion for Award of Attorney Fees and Expenses (Doc. #32) and Faurecia's Motion for Summary Judgment (Doc. #42). Both of these Motions are fully briefed and now ripe for decision. Satterwhite's Motion for Award of Attorney

Fees and Expenses will first be addressed followed by Faurecia's Motion for Summary Judgment.

## MOTION FOR AWARD OF ATTORNEY FEES AND EXPENSES

In an Order entered on October 5, 2004 (the "Order"), this Court granted Satterwhite's Motion To Compel. (Doc. #29.) Faurecia was ordered to provide certain personnel files, financial information and payroll information to Satterwhite that Satterwhite had made a good-faith effort to obtain and Faurecia had refused to provide.

Satterwhite's Motion To Compel also included a request for attorneys fees and expenses. Since Faurecia had responded to the Motion To Compel but not to the request for attorneys fees and expenses, the Parties were given an opportunity to brief the issue. Satterwhite then filed its Motion for Award of Attorneys Fees and Expenses which is now fully briefed and ripe for decision.

If a motion to compel is granted, "the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion …to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees …" Fed.R.Civ.P. 37(a)(4)(A). Thus, after the court grants a motion to compel and provides the responding party an opportunity to be heard, it "shall" require the responding party to pay the moving party's expenses unless the responding party had a "substantial justification" or some other circumstance makes such an award unjust. *Youn v. Track, Inc.*, 324 F.3d 409, 421 (6th Cir. 2003).

In this case, Faurecia argues that an award of attorneys' fees and expenses is not justified because Faurecia had a substantial justification for not providing the discovery. Faurecia's

substantial justification is that it felt that Satterwhite's discovery requests were improper and unwarranted. In support, Faurecia restates the arguments that it presented in response to the Motion To Compel.

However, as already determined by this Court in the Order, Satterwhite's requests were proper and warranted and Faurecia did not have a substantial justification for not providing the requested discovery. Therefore, Faurecia has not presented substantial justification for not providing the discovery and Satterwhite is entitled to attorneys' fees and expenses. The analysis next turns to the amount being requested by Satterwhite.

"The primary concern in evaluating a request for attorney fees 'is that the fee award be reasonable.'" *Paschal v. Flagstar Bank*, FSB, 297 F.3d 431, 434 (6th Cir. 2002)(quoting *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999), *cert. denied*, 537 U.S. 1227). Further, "[a] reasonable fee is one that is adequate to attract competent counsel but does not produce windfalls to attorneys." *Id.*

In determining a reasonable fee, the most useful starting point is to calculate the reasonable number of hours spent on the litigation multiplied by a reasonable hourly rate. *Id.* at 434. The result is known as the "lodestar" amount. *Id.*

There is generally a strong presumption that an attorney is entitled to her or his "lodestar" fee. *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000). However, the court may, within limits, modify the "lodestar" to reflect considerations relevant to the specific litigation. *Adcock-Ladd*, 227 F.3d at 349. Yet, modifications to the lodestar amount are proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record

and detailed findings by the court. *Id.* (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986)).

The party seeking attorneys' fees bears the burden of documenting his or her entitlement to the fees. *Reed*, 179 F.3d at 472. The applicant should submit evidence supporting the hours worked and the rates claimed. *Id.* If the documentation is inadequate, the court may reduce the award accordingly. *Id.*

In this case, Satterwhite has met its burden of documenting the number of hours worked on its Motion To Compel and the associated documents. (Doc. #32.) Satterwhite has documented a total of 43.55 hours worked by various professionals to attempt to obtain the requested discovery, to prepare its Motion To Compel and the Reply and to prepare the Motion for Award of Costs and the associated Reply.

Satterwhite has also presented hourly rates for its work associated with the Motion To Compel that range from $85 per hour to $185 per hour. In addition, Satterwhite has presented evidence that $185 per hour is fair and reasonable based upon the experience of the attorney in the employment-law field.

The total request presented by Satterwhite is $6,166.75 for attorneys' fees and $122.35 for LEXIS computer research expenses. This request includes $245.50 for extrajudicial efforts to resolve the discovery dispute.

Faurecia argues that this amount is excessive and that no more than $6,000 worth of legal time should have been expended. However, Faurecia does not explain why the amount requested by Satterwhite is excessive.

The hours documented by Satterwhite to prepare the Motion To Compel and Reply and to prepare the Motion for Award of Attorneys' Fees and Reply are reasonable and necessary given that the work was necessitated by Faurecia's failure to comply with its discovery obligations. Further, the hourly rates charged by Satterwhite are reasonable for the type of work performed. These rates are adequate to attract competent counsel for the type of work performed but do not produce windfalls to attorneys. Finally, Faurecia has not explained why the hours expended or the hourly rates are unreasonable.

Because the hours spent on preparing the Motion To Compel and the associated Reply and the Motion for an Award of Attorneys' Fees and the associated Reply are reasonable and the rates charged are reasonable, the "lodestar" amount sought by Satterwhite for this work is reasonable. Further, modifications to the "lodestar" amount in this case are not sought nor does this case present one of the 'rare' and 'exceptional' cases where a multiplier of the "lodestar" amount should be considered.

In addition to its work on the Motion To Compel, Satterwhite is seeking to be reimbursed for its expenses relating to extrajudicial attempts to resolve the discovery dispute. However, while these attempts are contemplated, if not required, by the Federal Rules of Civil Procedure, they are not considered by this Court to be includable in the reasonable attorneys' fees and expenses necessary to prepare the Motion To Compel and associated documents. Therefore, Satterwhite's request in the amount of $245.50 for attorneys' fees related to extrajudicial attempts to resolve the discovery dispute will not be granted.

In sum, attorneys' fees in the amount of $5,921.25 and expenses in the amount of $122.35 to prepare the Motion To Compel and Reply and to prepare the Motion for Award of

Attorneys' Fees and Reply are reasonable. Therefore, Faurecia is order to pay Satterwhite $6,043.60.

## MOTION FOR SUMMARY JUDGMENT

The analysis next turns to Faurecia's Motion for Summary Judgment. (Doc. #42.) Faurecia seeks summary judgment on all five of Satterwhite's claims. A brief statement of the factual background, when viewed in a light most favorable to Satterwhite for purposes of Faurecia's Motion for Summary Judgment, will first be set forth followed by the standard of review for motions for summary judgment and an analysis of each of Satterwhite's claims with regard to Faurecia's Motion for Summary Judgment.

## <u>Standard of Review</u>

The standard of review applicable to Motions for Summary Judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might

support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

In addition to his federal claims, Satterwhite's Complaint includes claims brought pursuant to Ohio law. In reviewing an Ohio claim, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the state.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998)).  Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms. Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994)). The analysis next turns to the factual background.

## Factual Background

Satterwhite is an Afro-American male who began working at the Troy facility of Tube Products Corporation, a predecessor of Faurecia, in August, 1996. (Satterwhite Dep. at 23.) He had been incarcerated before getting the job at Tube Products and the job was important to him and a teenage son of whom he had custody. (Id. at 4, 24, 93.)

Satterwhite was initially employed as a welder and, in 1999, was promoted to a line leader position for Line 3 at the Troy facility. (Id. at 29-36.) As a line leader, Satterwhite was under the supervision and control of Production Coordinator Randy Moore ("Moore") and Manufacturing Supervisor Mike Tedore ("Tedore"). (Id. at 33-38.) Moore and Tedore are Caucasian.

Jerri Oliver ("Oliver") was hired as the Human Resources Manager at the Troy facility on December 1, 1997. (Oliver Dep. at 10, 14.) A month later, on January 1, 1998, Bryan Imhoff ("Imhoff") became the Plant Manager at the Troy facility. (Id.)

Tedore is still employed with Faurecia (Tedore Dep. at 7) as are Oliver and Imhoff. Moore was drug tested on the same day as Satterwhite and tested negative. (Satterwhite Dep. at 49.) Moore resigned immediately after his drug test even though he tested "negative" for drugs. (Oliver Dep. at 99.)

Tedore, who was Satterwhite's direct supervisor, described Satterwhite's job performance as exemplary. (Tedore Dep. at 35.) He described Satterwhite's abilities, compared to the other line leaders, as "the benchmark" and as "setting the standard" for other line leaders. (Id. at 42-43.) In addition, Satterwhite received positive recognition in the form of official awards and certificates for his work performance. (Plaintiff's Memo. In Opposition, Ex. 1.)

Satterwhite and others testify to several incidents which Satterwhite believes constitute racial harassment and result in a hostile work environment. Satterwhite's Claims are also related to drug testing that took place during his employment at Faurecia.

Work Environment

There is evidence, when viewed in a light most favorable to Satterwhite, that the work environment at Faurecia may have been racially offensive to Satterwhite and others.  One of the others is Tedore who believed that there was racial tension at Faurecia. (Tedore Dep. at 83.) Some of the evidence presented relates to (1) the work environment in general, some relates to (2) Satterwhite's leadership position and some relates to (3) Satterwhite's treatment by Oliver.

1. One example of the work environment in general is that there were several people at Faurecia who thought the word "nigger" was not racist so it was common for them to use it. (Satterwhite Dep. at 79, 100.) Another example is that several employees would meet behind the welding curtains and say things such as "I'm proud to be a redneck." (Id. at 96.)

In addition to the verbal expressions, there was racial graffiti in the bathroom. (Oliver Dep. Vol. III at 70-71, Robert Hebb Aff. ¶8.) In response, Faurecia recognized the presence of graffiti and developed a system of making sure the walls were checked and cleaned. (Oliver Dep. Vol. III at 70.)

In addition to the verbal expressions and graffiti, there were alleged incidents that were racially offensive. For example, there was a vehicle, or vehicles, in the plant parking lot that exhibited expressions that were racially offensive. (Satterwhite Dep. at 147-50.) The expressions include a noose hanging from the rear view mirror, a bumper sign that said "slave wanted…no experience" and another bumper sticker that said "WE WANT AMERICA BACK." (Id.) In another incident, a second-shift line leader was allegedly distributing pamphlets recruiting for the KKK. (Id. at 151.)

Some of the actions that had racial inferences were directed specifically at Satterwhite. For example, people would make monkey sounds or say things that were mocking Satterwhite like "you built like a monkey." (Id. at 99-103.) In addition, obscene "gestures" were placed on Satterwhite's desk including a Volkswagen with tinted windows which turned white after a bunch of "black" people got out and "little balls of penises." (Id.)

Some of the actions did not have specific racial inferences but were directed toward Satterwhite who is Afro-American. For example, someone cut the legs off of Satterwhite's chair. (Id. at 108.) Also, during a charity event, someone was paid to throw a pie in Satterwhite's face while he was trying to work. (Id. at 123-24.)

2. There are also specific factual allegations that involve both race and Satterwhite's leadership position at Faurecia. In general, Satterwhite felt that the employees on his line would not follow his leadership because of his race. (Id. at 175-76.) Others came to this same conclusion.

Tedore observed that Satterwhite was subjected to racial slurs by white employees on his line, and accused of wrongdoing by these same individuals who did not like working for a black man and wanted him to quit. (Tedore Dep. at 71.) Elizabeth Gadson, another Faurecia employee, also confirms that the "white" employees on the line did not like working for a "black" man. (Gadson Aff.)

Robert Hebb ("Hebb"), a line leader at Faurecia at the time, testifies that there were several white employees on line 3 and in the plant that made racially offensive statements about Satterwhite. (Hebb Aff. ¶3.) Hebb witnessed Charlie Fisher, a Caucasian who worked on line 3,

pull out a sign that was made to look like a want-ad that said, "Small Black Man Wanted For Mud Flap." (Id.)

Satterwhite also believed that several people tried to sabotage his line by putting defective parts in the containers with the good parts and by changing the weld fixtures. (Satterwhite Dep. at 109-11.) Satterwhite complained to Tom Bauer ("Bauer") about this. (Id. at 112-14.) Bauer was the engineer for Line 3. (Id.)

Jim Juskae ("Juskae"), a welder at Faurecia made a statement that if a drug test taken by Satterwhite indicated negative results, he was going to leave the line. (Id. at 94.) Juskae was an employee on Satterwhite's line. (Oliver Dep. at 50-55.)

At one point, Juskae asked to move to the line supervised by Hebb after working on Satterwhite's line. (Hebb Aff. ¶6.) While working for Hebb, Juskae was given an evaluation form to complete. (Id.) Jim Juskae wrote that his goal for 2001 was "to be able to watch Faurecia escort Billy Satterwhite out the door" in the self-appraisal section of his performance appraisal. (Oliver Dep. Vol. III at 93, Hebb Aff. ¶6.) Juskae had also openly voiced opposition to working on Satterwhite's line with statements like "I am not going to work for that Nigger." (Hebb Aff. ¶6.) Juskae was the one who later alleged that Satterwhite was using drugs, yet the resulting test was negative. (Oliver Dep. at 50-58.)

3. Finally, there are specific factual allegations that relate to Oliver's attitude toward and treatment of Satterwhite. Satterwhite felt that Oliver and other management employees were out to get him and that Imhoff and Oliver went out of their way to investigate claims being made by Caucasian employees against him for purposes of harassing him. (Satterwhite Dep. at 172-73.)

While Satterwhite was a line leader, various employees made claims against him. (Id. at 128.) When Oliver investigated these complaints and found the employee to be wrong or lying, Oliver would put them back on the line. (Id. at 129.) Oliver would not back Satterwhite when the employee who complained was wrong. (Id. at 171.)

For example, Satterwhite alleges that Oliver put someone back to work that had been fired and told them not to tell him (Satterwhite ) about it. (Id. at 108.) Satterwhite also believes that Oliver was trying to find somebody that worked on his line to discredit him. (Id.)

Hebb testifies that company officials had knowledge of Satterwhite being harassed. (Hebb Aff. ¶7.) He specifically recalls that Oliver confided to him that many of the problems employees had with Satterwhite were due to his race. (Id.) Also, Tedore testifies that Satterwhite was called into the office more than any other line leader. (Tedore Dep. at 75.)

Drug Testing

During Satterwhite's employment, Faurecia issued a handbook setting forth the terms of employment for employees at the Troy facility. (Oliver Dep. at 24.) The handbook included equal employment and substance abuse policies. (Oliver Dep. Ex. C.)

The substance abuse policy stated that Faurecia "strictly forbids the use, possession, or sale of alcohol or drugs while at work…" (Id.)  However, the policy did not provide that violation would always result in termination. (Oliver Dep. at 48.)

The handbook provided that the Company could require drug testing of any employee when the Company had "reasonable suspicion" that the employee had used or was under the influence of drugs or alcohol. (Id.) Under the "reasonable suspicion" policy, an employee was sent for testing whenever behavior was observed that led the Company to suspect a violation of

-13-

the policy, or whenever someone made a personal or signed report to the Human Resources Department identifying alleged violators of the policy. (Id. at 43-45.)

The handbook also required employees taking prescribed medication to report such use to Human Resources. (Oliver Dep. Ex. B.) When there was an indication that the prescription medication could make it unsafe for the employee to operate equipment, the employee was sent home. (Oliver Dep. at 35.) For example, employees who operated any type of equipment were sent home if they were using Vicodin. (Id. at 37-38, 126.)

When an employee is sent for drug testing, it was Faurecia's policy that the employee be sent home until the results were known. (Id. at 59.) If the results were negative, the employee was paid for the time off. (Id.)

The drug testing was done at the Conover Center Occupational Medicine Department which is operated by Kettering Workers Care. (Sankar Dep. Ex. 2.) The urine samples are sent to Compunet Labs for evaluation. (Id.)

Satterwhite's May 2001 Drug Test

Sometime in May of 2001, Juskae came to Oliver's office and told her that he had observed Satterwhite's behavior as fluctuating rapidly. (Oliver Dep. at 50-55.) Juskae also alleged that he had seen Satterwhite leave the building frequently and had once been seen in his car taking a drug. Based upon this discussion, Satterwhite was sent for a drug test. (Id.)

The results of this test of Satterwhite were negative and Satterwhite returned to work. (Id. at 58.) Oliver then told Juskae that the policy had been followed, the results were negative and that she expected a good working relationship between Satterwhite and Juskae. (Id.)

-14-

Satterwhite's October 2001 Drug Test

In September of 2001, Satterwhite was having a problem with one of his teeth. (Satterwhite Aff. ¶1.) Tedore, Steve Swann ("Swann") and Linda Harris ("Harris") urged him to see a dentist about this problem. (Id.) Swann was the Production Manager (Oliver Dep. at 42.) Harris was an assistant to Oliver. (Id. at 88.)

On September 21, 2001, Satterwhite saw a dentist and had the tooth extracted. (Satterwhite Aff. ¶2.) The dentist gave Satterwhite a prescription for Vicodin for pain and for Keflex, an antibiotic. (Id.) After the dentist appointment, Satterwhite reported the use of this medicine to Swann. (Satterwhite Dep. at 142, Satterwhite Aff. ¶3.) Tedore also indicates that he knew that Satterwhite was using Vicodin and that he told Oliver and Swann. (Tedore Dep. at 99-100.)

Then, on October 17, 2001, Perry Simmons ("Simmons"), an African-American employee, stated that Mike Casey ("Casey"), a Caucasian employee, was using drugs. (Oliver Dep. at 66-67, Vol. II at 5-7.) After Oliver and others searched and observed Casey, they decided to send him for drug testing. (Oliver Dep. at 66.)

Casey was then transported to the clinic for testing. (Id. at 75.) Upon arrival at the clinic, Casey refused to be tested and confessed that he had smoked marijuana the previous evening. (Id.) Oliver then informed Casey that, pursuant to the policy, he would be terminated. (Id. at 75-77.)

Casey then returned to the Troy facility to pick up his personal belongings. (Id.) Upon his arrival at the Troy facility, Casey allegedly said to Oliver, "If I'm going down, you need to know these others need to be tested too." (Id. at 78.) Casey then named Satterwhite, Moore, Hebb and

-15-

Michelle Whorton ("Whorton") who was an hourly employee. (Id. at 83-84.) At the time, Casey allegedly said, "this is a white black thing" and "this is black retaliation, I think. Management doesn't do their job." (Id. at 82-86.)

Casey's statements became the basis for sending the four people that he named for drug testing. (Id. at 83.) The four individuals were sent to the Conover Center Occupational Medicine Department in Troy for testing that same day. (Id. at 95.)

Moore submitted his resignation upon his return from the clinic. (Id. at 98-99.) Moore's drug test later came back as negative. (Id. at 99.) Whorton also tested negative and was returned to work. Hebb, a Caucasian, tested positive for marijuana and was discharged as soon as his test results were received. (Oliver Dep. Ex. D., Vol. III at 52.)

Three tests were run on the urine sample that Satterwhite provided on October 17, 2001. The results of the first test were reported to Kettering Workers Care on October 19, 2001. (Defendant's Motion for Summary Judgment, Ex. E.) The first test indicated the presence of morphine. (Id.)

An additional test was order by Dr. Klein at Kettering Workers Care to further identify the presence of opiates. (Sankar Dep. at 24, Ex. 2.) The results of the second test were reported to Kettering Workers Care on October 26, 2001. (Id.)

After viewing the results of the second test, Satterwhite was asked to come to the clinic for an examination. (Oliver Dep. at 30, 31, 40, 123; Satterwhite Aff. ¶4; Sankar Dep. Ex. 2.) The examination revealed no clinical evidence of telltale or recent signs of needle tracks on Satterwhite's body. (Sankar Dep. At 69, Ex. 2.)

When the lab contacted Satterwhite to ask him to come in, they asked if he was on medication. (Satterwhite Aff. ¶4.) He reported that he was taking Vicodin, diabetes medication and Keflex. (Id.) Dr. Sankar testifies that Satterwhite also indicated that he was on Vicodin when he came for the visual examination. (Sankar Dep. at 44, 64.)

After conducting the visual examination, Dr. Sankar contacted Oliver and reported the second test as negative but still showing something. (Oliver Dep. Vol II at 29-30.) Dr. Sankar also reported that his visual examination of Satterwhite did not show any evidence of needle use. (Shankar Dep. at 44, 64.) Oliver then agreed to pay for a third test. (Oliver Dep. Vol II at 29-30.)

After being examined by Dr. Sankar on October 26, 2001, Satterwhite, along with Clarence Carter, a friend, went into Faurecia and met with Imhoff and Carter. (Oliver Dep. Vol II at 27, 32.) Satterwhite was concerned and did not want to lose his job. (Oliver Dep. Vol. II at 73.) At that time, Satterwhite indicated that there was no way he could test positive and he thought someone might have put something into his coffee to cause him to fail the drug test. (Oliver Dep. Vol. II at 35, 63; Satterwhite Dep. at 66-68.)

The results of the third test were reported to Kettering Workers Care on November 9, 2001. (Defendant's Motion for Summary Judgment, Ex. H.) The third test established the presence of three synthetic opiates in Satterwhite's system. (Id.) They were hydrocondone, dihydrocodone and hydromophone. (Id.)

Dr. Klein reported the results of the third test to Oliver on the same day that they were received. (Oliver Dep. Vol. II at 57.) Based upon this information, Imhoff, with Oliver's approval, decided to discharge Satterwhite. (Oliver Dep. at 131-32.) The only reason Satterwhite was terminated was because he had tested positive for synthetic opiates. (Id.)

On November 12, 2001, Imhoff and Oliver terminated Satterwhite's employment via a telephone conversation. (Sankar Dep. Ex. 3.) The termination was confirmed in a letter dated November 15, 2001. (Id.) The letter indicates that Satterwhite was terminated as a result of a positive drug test for synthetic opiates. (Id.) The letter further indicates that the results were obtained after a second testing required by the lab and a third testing advised by the lab. (Id.)

Satterwhite was replaced as line leader by Jim Burns ("Burns"). (Tedore Dep. at 43, 44, 52.) Burns is a Caucasian. (Id.)

The toxicologist retained by Satterwhite indicates that Vicodin or its generic substitute is a synthetic opiate that contains hydrocodone and the metabolites of hydrocondone are hydromorphone and dihydrocodeine. (Plaintiff's Memorandum In Opposition, Ex. 5.) He further indicates that all three of these substances will show up in the urine. (Id.) In addition, the toxicologist indicates that the synthetic opiate compounds detected in Satterwhite's urine are the result of having taken Vicodin. (Id.) Finally, he indicates that the levels of these synthetic opiates found in Satterwhite's urine sample cannot be used to conclude that Satterwhite was under the influence of Vicodin at the time the sample was collected or that Satterwhite was using Vicodin in violation of the recommended dosage. (Id.)

Satterwhite challenges the reason for his termination. There exists a note dated October 31, 2001, from a physician indicating that Satterwhite is under his care for diabetes and hypertension and that he was taking Vicodin from a dentist for tooth pain. (Oliver Dep. Vol II at 54.) It further states that Satterwhite had reported a positive drug screen and the positive result could have been due to the hydrocondone in the Vicodin. (Id.) Also, after Satterwhite was terminated, Oliver confirmed from Faurecia's health insurance carrier that Satterwhite had

obtained a prescription for Vicodin in September of 2001. (Id. at 77-78.) Having set forth a

factual background, the analysis turns to Faurecia's Motion for Summary Judgment with regard

to each of Satterwhite's Causes of Action.

### First and Second Causes of Action: Race Discrimination

In his First Cause of Action, Satterwhite alleges that he was discriminated against

because of his race in violation of Title VII and in his Second Cause of Action he alleges that he

was discriminated against because of his race in violation of the Ohio civil rights statute.

Satterwhite's Title VII and Ohio race discrimination claims are considered under the Title VII

framework because Ohio's requirements are the same as under federal law. *Carter v. University

of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003).

To establish a Title VII employment discrimination claim, Satterwhite must present

either direct evidence of discrimination or circumstantial evidence that would allow an inference

of discriminatory treatment. *Id.* (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir.

2003)). In this case, Satterwhite has not pointed to direct evidence of discrimination nor is any

evident from the Rule 56 evidence that is now before the Court. Therefore, Satterwhite's race

discrimination claims must be analyzed under the *McDonnell Douglas - Burdine* burden-shifting

framework. Id. at 273.

Under the *McDonnell Douglas - Burdine* burden-shifting framework, Satterwhite must

first present a prima facie case of race discrimination. *Id.* To establish a prima facie case of race

discrimination, Satterwhite must show that (1) he is a member of a protected class, (2) that he

was subject to an adverse employment action, (3) that he was qualified for the position, and (4)

that he was replaced by a person outside of the protected class or that comparable, non-protected

persons were treated more favorably. *Peters v. Lincoln Electric Company,* 285 F.3d 456, 469-70 (6th Cir. 2002).

The burden then shifts to Faurecia to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action. *Carter,* 349 F.3d at 273. If Faurecia satisfies this burden, Satterwhite must then present evidence that the proffered reason was actually a pretext to hide unlawful discrimination. *Id.*

To demonstrate pretext, Satterwhite may show that Faurecia's proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Id.* at 274 (citing *Seay v. Tennessee Valley Authority,* 339 F.3d 454, 463 (6th Cir. 2003)). Further, it is not necessary for Satterwhite to introduce independent evidence of discrimination in addition to introducing evidence establishing the falsity of Faurecia's articulated reason for his termination. *Hopson v. DailmerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002).

Prima Facie Case

In this case, Satterwhite has established a prima facie case of race discrimination that is not challenged by Faurecia for purposes of its Motion for Summary Judgment. Satterwhite has presented evidence that he is an Afro-American making him a member of a protected class. He has presented evidence that he was terminated which is an adverse employment action. He has presented evidence that he was qualified to do the job and he has presented evidence that he was replaced by a Caucasian who is a person outside the protected class.

Legitimate, Nondiscriminatory Reason

The analysis turns to the second step of the three-step framework whereby Faurecia must set forth a legitimate, nondiscriminatory reason for Satterwhite's termination. In this case, Faurecia presents evidence that Satterwhite was terminated because he tested positive for synthetic opiates. Faurecia's substance abuse policy "strictly forbids the use, possession, or sale of alcohol or drugs while at work…" This is arguably a legitimate, nondiscriminatory reason for Satterwhite's termination.

Pretext

The analysis then turns to the third step of the framework whereby Satterwhite must show that the reason stated by Faurecia is a pretext for discrimination. Satterwhite may demonstrate pretext by showing that Faurecia's proffered reason has no basis in fact, did not actually motivate the defendant's challenged conduct or was insufficient to warrant the challenged conduct.

Satterwhite presents evidence that synthetic opiates found in the urine sample that was the basis for his termination were consistent with the results that could be expected for an individual that was taking the prescription drug Vicodin. He also presents evidence that he could not be found to be under the influence of Vicodin at the time the urine sample was taken or that he was taking Vicodin in violation of the recommended dosage. Finally, the use of prescription drugs is not prohibited by Faurecia's policy.

Faurecia's response is that they also have a policy requiring workers to report the use of prescription drugs to Human Resources and, when there was an indication that the prescription medication could make it unsafe for the employee to operate equipment, the employee was sent

home. In light of this policy, Faurecia argues that Satterwhite did not conform to this policy because he had not reported the use of Vicodin to Human Resources.

However, Satterwhite presents evidence that he reported such use to his supervisor who then reported such use to Human Resources and others in management. He also presents evidence that those who made the decision to terminate him may arguably have been aware of his use of Vicodin from other sources at the time the decision was made to terminate. Finally, Satterwhite presents expert testimony that he was "not under the influence" of Vicodin at the time he was tested and, therefore, would presumably not be unsafe to operate equipment.

In addition to the evidence regarding the use of Vicodin. Satterwhite also presents evidence regarding the atmosphere in which the decision to terminate him was made. He presents evidence that Caucasian coworkers had animosity toward him because of his race, that these same coworkers were the ones who alleged that he was using drugs, and that those who made the decision to drug test and terminate him were aware of this animosity. In addition, there is evidence that one or more of those who decided to terminate Satterwhite may also have had some animosity toward him, albeit non-racial. Also, Satterwhite presents evidence that Faurecia's substance abuse policy does not require termination for a violation. Finally, Satterwhite presents evidence that at least one of the decisionmakers admits that there are probably numerous individuals at Faurecia who are using prescription drugs and do not report them.

In sum, Satterwhite has presented evidence from which a reasonable juror could conclude that the reason given for his termination was a pretext for discrimination because it had no basis in fact, did not motivate his discharge and was insufficient to warrant his discharge. Therefore,

when viewing the evidence in a light most favorable to Satterwhite, there genuine issues of material fact and Faurecia is not entitled judgment as a matter of law. Faurecia's Motion for Summary Judgment on Satterwhite's First and Second Causes of Action for race discrimination is OVERRULED.

### Third Cause of Action: Hostile Work Environment

In his Third Cause of Action, Satterwhite alleges that he was subjected to a hostile work environment in violation of Title VII and Ohio law. As with the race discrimination claims, Satterwhite's Title VII hostile work environment claim and Ohio hostile work environment claim are considered under the Title VII framework because Ohio's requirements are the same as under federal law. *Carter*, 349 F.3d at 272.

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer to require people to work in an environment that is hostile or abusive due to discrimination based on an individual's race, color, religion, sex or national origin. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Whether an environment is hostile or abusive is determined by looking at all of the circumstances including the frequency of the discriminatory conduct; the severity of the discriminatory conduct; whether the discriminatory conduct was physically threatening or humiliating, or a mere offensive utterance; and whether the discriminatory conduct interferes with an employee's work performance. *Id.* at 23. Further, conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment is "beyond Title VII's purview" as is conduct that is not subjectively perceived by the victim to be abusive *Id.* at 21.

-23-

Thus, the conduct in question must be judged by both an objective and a subjective standard. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. *Id.* In addition, the alleged victim must subjectively find the environment to be abusive. *Id.* However, the subjective component does not require that a victim report a hostile environment.  *Williams v. General Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999).

The first four elements of a hostile work environment claim are the same for claims stemming from a coworker's actions and from a supervisor's actions. *Williams*, 187 F.3d at n.4. The first four elements are: (1) plaintiff was a member of a protected class; (2) plaintiff was subject to unwelcome harassment; (3) the unwelcome harassment was based on being a member of the protected class; and (4) the harassment created a hostile work environment. *Williams*, 187 F.3d at 560.

The fifth element depends upon whether the hostile work environment was caused by a coworker or a supervisor. If the hostile work environment stemmed from the actions of a coworker, the plaintiff must prove that the employer knew or should have known of the charged harassment and failed to implement prompt and appropriate corrective action. *Id.* at 560. If the hostile work environment stemmed from the actions of a supervisor, an employer has an affirmative defense if it took reasonable care to prevent and correct any harassing Title VII behavior. *Id.* at 561. For purposes of this analysis, a supervisor is an individual with immediate or successively higher authority over the employee. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, (6th Cir. 2000) (citing *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742 (1998)).

In this case, Satterwhite's Complaint and his Response to the Defendant's Motion for Summary Judgment allege harassment stemming from the actions of coworkers. Neither of these two documents alleges harassment stemming from the actions of Satterwhite's supervisor or someone with successively higher authority. Therefore, liability, if any, is based directly upon Faurecia's conduct. *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999). Faurecia is liable if it knew or should have known of the charged racial harassment and failed to implement prompt and appropriate corrective action. *Id.* (citing *Pierce v. Commonwealth Life Insurance Co.*, 40 F.3d 796, 804 n.11 (6th Cir. 1994)).

 In the case of coworker harassment, the act of discrimination by the employer is the inappropriate response to the charge of harassment. *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998). The appropriateness of an employer response depends upon the frequency and severity of the alleged harassment and must reasonably be calculated to end the harassment. *Id.* at 872. Said another way, an employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known. *Id.* at 873.

Regarding the first element of a prima facie case, Satterwhite is an Afro-American and thus a member of a protected class. Regarding the second element, Satterwhite testifies that the alleged harassment was unwelcome.

Regarding the third and fourth elements,  Satterwhite presents evidence that he was subjected to harassment by coworkers based upon being an Afro-American. There was racial tension at Faurecia. The environment in which Satterwhite worked included the use of the term "nigger" by coworkers; statements by coworkers that "I'm proud to be a redneck;" racially

oriented graffiti in the bathroom; a vehicle in the parking lot with a noose hanging from the rear view mirror, a bumper sign saying "slave wanted…no experience" and a bumper sign that said "WE WANT AMERICA BACK;" a coworker distributing pamphlets recruiting for the KKK; people making monkey sounds and making statements that mocked Satterwhite like "you build like a monkey;" racially obscene gestures placed on Satterwhite's desk; cutting the legs off of Satterwhite's chair; throwing a pie in Satterwhite's face while he was working; racial slurs directed at Satterwhite, individuals on Satterwhite's Line that did not want to work for an Afro-American and expressed such desire verbally and in writing; a sign that said "Small Black Man Wanted For Mud Flap;" and sabotage of Satterwhite's Line.

Satterwhite also argues that he was subjected to harassment by management employees based upon being an Afro-American. He presents evidence that Oliver, the Human Resources Manager, indicated that many of the problems employees had with him were due to his race. Further, there is testimony that, when Oliver investigated complaints against him and found the employee to be wrong or lying, Oliver would put the employee back on the line and not support Satterwhite. There is also testimony that Oliver put someone who had been terminated back to work and instructed the returning employee not to tell Satterwhite. In addition, there is evidence that Satterwhite was called to the office more than any other line leader.

The totality-of-the-circumstances test requires that the court consider harassment by all perpetrators combined when determining the existence of a hostile work environment. *Williams,* 187 F.3d at 562. In this case, a reasonable juror could conclude that the harassment by Satterwhite's coworkers and Faurecia management combined was severe and pervasive enough

to create an environment that a reasonable person could find hostile. A reasonable juror could also conclude that the harassment was based upon Satterwhite's race.

Regarding the subjective test, Faurecia argues that Satterwhite did not report the harassment. (Satterwhite Dep at 78, 89, 102, 104, 106, 119, 150, 153.) However, there is evidence that Satterwhite felt that he was being racially harassed and did report the harassment. (Satterwhite Dep. at 79, 96, 99-103, 108-11; Oliver Dep. III at 38, 42.) Therefore, the subjective test of a hostile work environment is satisfied.

Satterwhite has presented evidence that satisfies the requirements for the first four elements of a prima facie showing that he was subjected to a hostile work environment. The analysis now turns to the fifth element regarding Faurecia's liability. To satisfy the fifth and final element, Satterwhite must show that Faurecia knew or should have known of the charged harassment and failed to implement prompt and appropriate corrective action.

There is evidence that Faurecia management, including their Human Resources Manager, knew of the hostile conditions in the workplace. Therefore, the analysis of the fifth element turns on whether Faurecia implemented prompt and appropriate corrective action.

Satterwhite argues that Faurecia did not implement prompt and appropriate corrective action. In support, Satterwhite points to evidence that, when a young Caucasian woman who worked on his line complained of sexual harassment by Satterwhite, the allegation was deemed not credible. She was, however, returned to his line instead of being moved to another place in the plant. (Satterwhite Dep. at 129-30.)

Sidney Wheat ("Wheat"), a Faurecia supervisor until his retirement in December 2001, testifies that Oliver ignored complaints if they were made by a "black person." (Wheat Aff. ¶4.)

-27-

She, however, investigated complaints made by a "white person" to the limit. (Id.) Wheat also describes an incident where one of the employees who reported to him used the phrase "nigger-rigged" and the employee was transferred instead of being terminated in accordance with company policy. (Id. ¶9.)

Hebb testifies that he knew of "numerous" instances of racial harassment that happened during his employment at Faurecia. (Hebb Aff. ¶5.) Yet, he knew of only one time when an employee was disciplined for such an action. (Id.)

Faurecia responds that it had in place a policy that it would not tolerate harassment of any kind. In one instance, an employee who referred to an Afro-American as "nigger" was promptly suspended (Tedore Dep. at 77.) After that incident, a work rule was added to the handbook in April 2001 specifically stating that an employee who used racial slurs would be disciplined (Defendant's Motion for Summary Judgment, Ex. C, p. 33, Rule 11.) Oliver conducted meetings with various lines regarding the new rules and clearly stated that racial slurs would not be tolerated. (Oliver Dep. III at 56-57.)

In addition, there is evidence that Faurecia conducts monthly employee meetings in which they talk about, among other things, sexual harassment and inappropriate conduct and language. (Oliver Dep. III at 58.) However, this testimony does not specifically identify monthly discussions regarding racial issues.

Having a policy in place and making one work rule addition regarding racial slurs is not prompt and appropriate corrective action in response to the alleged hostile work environment that management allegedly knew existed at Faurecia. Faurecia's arguable indifference or unreasonableness toward the hostile work environment is evidenced by the testimony of

Faurecia's Human Resources Manager. In light of the evidence of a hostile work environment in the plant and in light of evidence that she knew or should have known of this environment, Faurecia's Human Resources manager, testified that there were no racial problems at the time of Satterwhite's second drug test (Oliver Dep. at 86), that there were only two prior racial incidents (Oliver Dep. at 87), and that she was not aware that people in the plant, particularly on Satterwhite's line, did not want to work for an Afro-American (Oliver Dep. III at 39.)

Satterwhite has presented evidence that, when viewed in a light most favorable to him, presents a prima facie case of a hostile work environment that was created by coworkers, was known by Faurecia and was not responded to with prompt and appropriate corrective action. Therefore, Defendant's Motion for Summary Judgment regarding Satterwhite's Third Cause of Action for racial harassment/hostile work environment is OVERRULED.

### Fourth Cause of Action: Wrongful Discharge In Violation of Public Policy

In his Fourth Cause of Action, Satterwhite alleges that his employment at Faurecia was terminated on November 12, 2001, in violation of Ohio public policy as expressed in O.R.C. §§4112.02, 4112.02(A) and 4112.99 and the Ohio Constitution. Faurecia argues that this Cause of Action should be dismissed because Ohio's civil rights statute, O.R.C. §4112 et seq., provides an adequate remedy. Satterwhite responds that, until the Ohio Supreme Court rules on the issue, a separate public policy exists on which his claims survive summary judgment.

The Ohio Supreme Court has held that employment decisions that contravene public policy cannot be upheld under the employment-at-will doctrine. *Mischer v. Erie Metropolitan Housing Authority*, 345 F.Supp.2d 827, 831 (N.D.Ohio 2004)(citing *Painter v. Graley*, 639 N.E.2d 51 (Ohio 1994)). The Ohio Supreme Court also recognizes an exception to the traditional

employment-at-will doctrine where the public policy alleged to have been violated is of equally serious import as the violation of a statute. *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990). The resulting tort is known as "wrongful discharge in violation of public policy" or a "*Greeley* claim." *Bicudo v. Lexford Properties, Inc.*, 812 N.E.2d 315, 327(Ohio Ct. App. 2004).

     *Greeley* did not allow the tort to be brought for anything other than the violation of a statute. *Id*. However, this requirement was broadened by the Ohio Supreme Court in *Painter v. Graley* where it said that a *Greeley* claim could be brought for contravention of a "clear public policy." 639 N.E.2d 51 (Ohio 1994). Further, clear public policy sufficient to justify an exception to the employment-at-will doctrine may be found in statutes and other sources such as the Constitutions of Ohio and the United States, administrative rules and regulations and the common law. *Bicudo,* 812 N.E.2d at 327 (citing *Tulloh v. Goodyear Atomic Corp.*, 584 N.E.2d 729 (Ohio 1992).

     The Ohio Supreme Court has adopted a four-part test to establish a public policy cause of action:

     1. that a clear public policy existed and was manifested in a state or federal constitution, statute, or administrative regulation, or in the common law (the clarity element);

     2. that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element);

     3. the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and

     4. the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Jakischa v. Central Parcel Express*, 106 Fed.Appx. 436, 2004 WL 1987131 (6th Cir. 2004).

The argument in this case involves the second element, the "jeopardy element." In *Collins v. Rizkana*, the Ohio Supreme Court, when reviewing whether the plaintiff was barred from pursuing a *Greeley* claim because the claim duplicated remedies provided by O.R.C. §4112.02, allowed the *Greeley* claim to be prosecuted because it was based upon multiple violations of public policy and the plaintiff could not avail herself of the remedy provided by O.R.C. §4112.02. 652 N.E.2d 653 (Ohio 1995). Seven years later in *Wiles v. Medina Auto Parts*, the Ohio Supreme Court held that a *Greeley* claim based upon a statute that provided an adequate remedy did not satisfy the "jeopardy element." 773 N.E.2d 526 (Ohio 2002). The Supreme Court said in *Wiles* that, "[s]imply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests." *Wiles*, 773 N.E.2d at 531.

Strong public policy against racial discrimination exists and is set forth in, among other places, Ohio's civil rights statute, O.R.C. §4112 et seq. In addition, Ohio's civil rights statute provides remedies for racial discrimination. O.R.C. §4112.99. Further, Satterwhite has not argued that the remedies provided by O.R.C. §4112.99 are not adequate and he has brought a discrimination claim pursuant to this statute. Therefore, the "jeopardy element" is not satisfied in this case because Satterwhite has made a race discrimination claim that provides adequate remedies.

Satterwhite argues that this Court should find that, until the Ohio Supreme Court rules on the issue, a separate public policy exists on which his claims survive summary judgment. First, the Ohio Supreme Court has already ruled on the "jeopardy element" as set forth hereinbefore. Second, the Southern District of Ohio case relied upon by Satterwhite for this argument is an age

discrimination case that relies upon cases decided before *Wiles* or cases that do not include a *Wiles* type of analysis or cases that apply a *Wiles* type of analysis and conclude that the underlying statutory claim is not valid for some reason. *Snyder v. Builders First Stone*, Case No. C-1-04-573, slip op. (S.D.Ohio December 10, 2004). Further, several cases decided after *Wiles* have found that Ohio law does not recognize a claim for discrimination in violation of public policy. *See, e.g.*, *Jakischa,* 2004 WL 1987131; *Mischer v. Erie Metropolitan Housing Authority,* 345 F.Supp.2d 827, 832 (N.D. Ohio 2004); *Lewis v. Fairview Hospital*, 806 N.E.2d 185 (Ohio Ct. App. 2004); *Barlowe v. AAAA International Driving School, Inc.*, 2003 WL 22429543, Case No. 19794 (Ohio Ct. App. Oct. 24, 2003); *Palesh v. Rockwell International Corp.*, 2002 WL 67911, Case No. 79725 (Ohio Ct. App. Jan. 17, 2002).

Ohio's civil rights statute, O.R.C. §4112 et seq., provides an adequate remedy for Satterwhite's race discrimination claim and he has not argued otherwise. Therefore, in accordance with Ohio law,  the "jeopardy element" of Satterwhite's public policy claim is not satisfied. There are no genuine issues of material fact and Faurecia is entitled to judgment as a matter of law. Faurecia's Motion for Summary Judgment regarding Satterwhite's Fourth Cause of Action is GRANTED. Satterwhite's Fourth Cause of Action for wrongful discharge in violation of public policy is DISMISSED.

### Fifth Cause of Action: Retaliation

In his Fifth Cause of Action, Satterwhite alleges that Faurecia retaliated against him for engaging in protected activity in violation of O.R.C. §4112.02(I). Satterwhite's Ohio retaliation claim is considered under the Title VII framework because Ohio's requirements are the same as

under federal law. *Carter*, 349 F.3d at 272; *Mulvin v. City of Sandusky*, 320 F. Supp.2d 627

(N.D.Ohio 2004) (citing *Chandler v. Empire Chemical, Inc.*, 650 N.E.2d 950 (Ohio 1994)).

Faurecia seeks summary judgment arguing that Satterwhite cannot satisfy three of the

four elements of a prima facie retaliation claim. Satterwhite responds that he can satisfy all four

elements.

To establish a prima facie case of retaliation, Satterwhite must show that: (1) he engaged

in activity protected by Title VII; (2) this exercise of protected rights was known to Faurecia; (3)

Faurecia thereafter took adverse employment action against Satterwhite or Satterwhite was

subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a

causal connection between the protected activity and the adverse employment action or

harassment. *Morris*, 201 F.3d at 792. Each element will be reviewed in turn.

### 1. Engaged In Activity Protected By Title VII

Employees who oppose a practice that has been made unlawful under Title VII are

protected. *Mulvin*, 320 F.Supp.2d at 634. Protected activities include making a charge, testifying,

assisting or participating in any manner in an investigation, proceeding, hearing or litigation

under Title VII. *McElroy v. Philips Medical Systems North America, Inc.*, Case Nos. 03-6219,

03-6351, 2005 WL 406335 at *10 (6th Cir. Feb. 18, 2005).

Satterwhite allegedly told Oliver in a peer review meeting regarding Perry Simmons

("Simmons") that black people in the plant were not being treated equally or fairly as compared

to white people. (Satterwhite Dep. at 177, 181; Simmons Aff. ¶5.) Satterwhite also allegedly told

Oliver that he was working in a racially hostile environment. (Oliver Dep. III at 38, 42.) Making

a charge regarding race discrimination and a charge regarding a racially hostile environment are protected activities. Therefore, Satterwhite has satisfied the first element of a retaliation claim.

### 2. Exercise of Protected Rights Was Known

To satisfy the second element, the employer must know that the employee engaged in the protected activity before the adverse employment action was taken. *Mulvin*, 320 F.Supp.2d at 634. In this case, Oliver, Faurecia's Human Resource Manager, was allegedly aware of Satterwhite's charge that black people in the plant were not being treated equally or fairly as compared to white people. (Satterwhite Dep. at 177, 181; Simmons Aff. ¶5.) Also Oliver testifies that she was aware that Satterwhite felt that he was working in a racially hostile environment. (Oliver Dep. III at 38, 42.) Therefore, Satterwhite has satisfied the second element of a retaliation claim.

### 3. Adverse Employment Action or Severe or Pervasive Retaliatory Harassment

An adverse employment action in most cases inflicts direct economic harm. *White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789, 798 (6th Cir. 2004)(citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)). Adverse employment actions are significant changes in employment status "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change to benefits." *Id.*

In this case, Satterwhite's employment was terminated by Imhoff and Oliver on November 12, 2001. Termination of employment is an adverse employment action. Therefore, Satterwhite has satisfied the third element of a retaliation claim.

### 4. Causal Connection Between Protected Activity and Adverse Employment Action

The required causal connection may be met by presenting evidence of a direct causal link or by presenting compelling circumstantial evidence that the protected activity was the likely reason for the adverse employment action. *McElroy,* 2005 WL 406335 at *9. Proximity in time between a protected activity and an adverse employment action may give rise to an inference of causal connection but a temporal relationship alone will not support an inference in the face of compelling evidence otherwise. *Steiner v. Henderson*, 121 Fed.Appx. 622, 2005 WL 221530 at **3 (6th Cir. Jan. 31, 2005).

Regarding temporal proximity, Satterwhite's concerns regarding treatment of blacks and working in a racially hostile environment were expressed before he was drug tested and subsequently terminated. (Satterwhite Dep. at 177.) Specifically, Satterwhite thinks that the meeting in which he told Oliver that black people in the plant were not being treated equally or fairly as compared to white people took place "weeks" before his second drug test. (Id.)

Circumstantial evidence regarding a causal connection between the protected activities in which Satterwhite engaged and his termination is found in Oliver's alleged knowledge and beliefs. Oliver was one of the two decisionmakers regarding Satterwhite's termination.

First, Oliver allegedly knew that Satterwhite had expressed a belief that he was working in a racially hostile environment and a belief that black people at Faurecia were not being treated equally or fairly as compared to white people. In addition, Oliver allegedly knew that there was racial tension and racial incidents in the workplace and that there was racial animosity toward Satterwhite.  Also, Oliver allegedly ignored complaints made by Afro-Americans and fully investigated complaints made by Caucasians. With this alleged knowledge as a backdrop, Oliver purportedly stated that many of Satterwhite's problems were due to his race.

A reasonable juror could conclude from this circumstantial evidence combined with the temporal proximity of Satterwhite's termination that there is a causal connection between the protected activity in which Satterwhite engaged and his termination. Therefore, Satterwhite has satisfied the fourth element of a retaliation claim.

Conclusion

When viewed in a light most favorable to Satterwhite, he has presented a prima facie case of retaliation. In addition, Faurecia does not challenge the retaliation claim beyond challenging proof of a prima facie case. Therefore, Faurecia's Motion for Summary Judgment on Satterwhite's Fifth Cause of Action for retaliation is OVERRULED.

**SUMMARY**

Satterwhite's Motion for Award of Attorneys' Fees is GRANTED. Attorneys' fees in the amount of $5,921.25 and expenses in the amount of $122.35 to prepare the Motion To Compel and to Reply and to prepare the Motion for Award of Attorneys' Fees and Reply are reasonable. Faurecia is order to pay Satterwhite $6,043.60.

Faurecia's Motion for Summary Judgment is GRANTED IN PART and OVERRULED IN PART. Regarding his Title VII and Ohio race discrimination claims, Satterwhite has presented evidence of a prima facie case of race discrimination and evidence from which a reasonable juror could conclude that the reason given for his termination is a pretext for race discrimination. Therefore, when viewing the evidence in a light most favorable to Satterwhite, there are genuine issues of material fact and Faurecia is not entitled judgment as a matter of law. Faurecia's Motion for Summary Judgment on Satterwhite's First and Second Causes of Action for race discrimination is OVERRULED.

Regarding his hostile work environment claim, Satterwhite has presented evidence that, when viewed in a light most favorable to him, establishes a prima facie case of racial harassment/hostile work environment. When viewing the evidence in a light most favorable to Satterwhite, there are genuine issues of material fact and Faurecia is not entitled to judgment as a matter of law. Therefore, Faurecia's Motion for Summary Judgment regarding Satterwhite's Third Cause of Action for racial harassment/hostile work environment is OVERRULED.

The "jeopardy element" of Satterwhite's Ohio public policy claim is not satisfied. There are no genuine issues of material fact and Faurecia is entitled to judgment as a matter of law. Faurecia's Motion for Summary Judgment regarding Satterwhite's Fourth Cause of Action is GRANTED. Satterwhite's Fourth Cause of Action for wrongful discharge in violation of public policy is DISMISSED.

When viewed in a light most favorable to Satterwhite, he has presented a prima facie case of retaliation and Faurecia is not entitled to judgment as a matter of law. Therefore, Faurecia's Motion for Summary Judgment on Satterwhite's Fifth Cause of Action for retaliation is OVERRULED. Satterwhite's race discrimination, hostile work environment and retaliation claims remain to be adjudicated.

**DONE** and **ORDERED** in Dayton, Ohio, this Thirty-First day of May, 2005.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record